UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BERKSHIRE MEDICAL CENTER, INC., )
                Plaintiff    )
                                )
                                )
      v.                           )      Civil Action No. 08-30099-KPN
                                )
                                )
U. W. MARX, INC.,                )
                Defendant   )

MEMORANDUM AND ORDER WITH REGARD TO DEFENDANT'S
MOTION FOR JUDGMENT AS A MATTER OF LAW (Document No. 59)
July 9, 2010

NEIMAN, U.S.M.J.

Pursuant to Fed. R. Civ. P. 50(b), U.W. Marx, Inc. ("Defendant") has renewed its motion, post-trial, for judgment as a matter of law against Berkshire Medical Center, Inc. ("Plaintiff"). For the reasons which follow, Defendant's motion will be denied.

I. STANDARD OF REVIEW

A jury verdict may not be set aside under Rule 50(b) "except on a determination that the evidence could lead a reasonable person to *only one conclusion*." *Acevedo-Diaz v. Aponte*, 1 F.3d 62, 66 (1st Cir. 1993) (citations and internal quotation marks omitted) (emphasis in original). Put differently, Rule 50(b) relief is warranted only if the evidence "is so one-sided that the movant is plainly entitled to judgment, for reasonable minds could not differ as to the outcome." *Gibson v. City of Cranston*, 37 F.3d 731, 735 (1st Cir. 1994). *See also Murray v. Ross-Dove Co.*, 5 F.3d 573, 576 (1st Cir. 1993) (proper to allow motion where evidence "would not permit a reasonable jury to find in

favor of the plaintiffs on any permissible claim or theory"). Evidence and reasonable inferences therefrom are viewed in a light most favorable to the nonmovant. *Mangla v. Brown Univ.*, 135 F.3d 80, 82 (1st Cir. 1998).

## II. BACKGROUND

The parties are fully conversant with the particulars of this case so no detailed exposition of its background is necessary. Suffice it so say for present purposes that this matter arose from a construction project to expand and renovate Plaintiff's facilities in Pittsfield, Massachusetts. Defendant was the general contractor and, as such, entered into certain contractual agreements with Plaintiff. At issue, among other things, was a "Trade Contractor Agreement" and a "Resolution Agreement" which covered Defendant's work on certain operating suite floors.

At trial, the jury specifically found via a Special Verdict Form (Doc. No. 51) that Plaintiff had proven that it had fully performed its obligations under the Trade Contractor Agreement (Question No. 1) and that Defendant had breached the express warranty contained therein (Question No. 2). The jury awarded Plaintiff damages of $331,835 (Question No. 4) which, with interest, resulted in a judgment against Defendant in the amount of $405,148.90. (The jury also found that Plaintiff had not proven, by a preponderance of the evidence, that Defendant breached the Resolution Agreement (Question No. 3).)

During trial -- first at the close of Plaintiff's case, then at the end of all the evidence -- Defendant moved for judgment as a matter of law. *See* Fed. R. Civ. P. 50(a). Both motions were denied. Presently, Defendant has filed a renewed motion for

judgment as a matter of law pursuant to Rule 50(b).  In due course, Plaintiff opposed the motion, Defendant filed a reply brief and Plaintiff filed a sur-reply.

III.  DISCUSSION

Defendant makes four assertions in support of its motion:  (1) the evidence established that Plaintiff did not give Defendant written notice and a fair opportunity to replace, *i.e.*, "cure," the operating suite floors as required under the terms of their contract; (2) the evidence established that Defendant fulfilled its warranty obligations pursuant to the contract; (3) there was no competent evidence that defects in the flooring were caused by faulty workmanship or material; and (4) the evidence of damages was disproportionate to the asserted defects.  For the reasons which follow, the court finds none of the arguments convincing.

A.  Evidence Regarding Notice and Warranty Obligations

Defendant's first two arguments are closely related and, in essence, center on the parties' Trade Contractor Agreement, which agreement includes certain General Conditions.  These two documents were entered into evidence, respectively, as Plaintiff's Exhibits 1 and 2.  As will be described, the court finds no merit in either Defendant's first argument, that Plaintiff failed to give proper notice or an opportunity to cure the flooring problems, or Defendant's second argument, that it fulfilled its warranty obligations.

With respect to the first of the two arguments, *i.e.*, the opportunity to cure, Defendant cites Article 7.1(c) of the Trade Contractor Agreement and argues that, in accord with any reasonable reading of the contract, Plaintiff failed to honor a notice

3

provision therein which would trigger Defendant's obligation to make good on its warranty; Defendant also argues that there was insufficient evidence that Plaintiff identified the defects in question, let alone the need for the entire flooring to be replaced. Defendant's second argument centers on the one-year warranty set forth in Article 7.1 of the Trade Contractor Agreement and Article 10.1 of the General Conditions. Defendant argues that the warranty period was fixed and had run before Plaintiff made any claim thereunder. The jury's verdict in Plaintiff's favor, Defendant argues, "only holds up if the Court applies a distorted and convoluted reading of either the warranty period or the evidence, or both." (Doc. No. 59 (Def.'s Brief) at 15.)

In pursuing its arguments, Defendant ignores both the Special Verdict Form and the Jury Instructions (Doc. No. 50), insofar as they set forth the elements of Plaintiff's express warranty claim, to which Defendant not object. The instructions made clear that Plaintiff could not recover unless it proved by a preponderance of the evidence, first, that it "fully performed *its* obligations under the Trade Contractor Agreement or was excused from performance" and, second, that Defendant "breached the express warranty contained in the Trade Contractor Agreement." (Instruction No. ¶ 21 (emphasis added).) The instructions also highlighted the same contractual provisions upon which Defendant now relies, Articles 7.1 and 7.1(c) of the Trade Contractor Agreement and Article 10.1 of the General Conditions. (Instruction No. ¶ 23.) In addition, the instructions cited Defendant's assertions that (a) Plaintiff had not met its burden of proof regarding Plaintiff's obligation to fully perform under the contract or to be excused from such performance, (b) any defects in workmanship or material did not

develop within one year of completion of the project, and (c) Plaintiff did not provide reasonable written notice to Defendant of any such defects, ask Defendant to correct them, or give Defendant a reasonable opportunity to do so. (Instruction No. 24). The instructions then pointed to Defendant's assertion that it promptly corrected any such defects which developed within one year of the project's completion. (*Id.*) Nonetheless, the jury found that Plaintiff had in fact proven by a preponderance of the evidence that it fully performed its obligations under the Trade Contractor Agreement or was excused from performance (Question No. 1) and that Defendant had breached the express warranty contained therein (Question No. 2).

Defendant's present arguments to the contrary, there was sufficient evidence for the jury to answer Question Nos. 1 and 2 as it did. For example, Defendant's own Exhibits 3 through 5 identified continuing problems with the floors in the operating suites and surrounding areas. It was also undisputed by several witnesses -- including Thomas Romeo, Joseph LaRoche, Thomas Urbano, and Peter Marx -- that Defendant was fully aware of the flooring defects and had attempted to repair them by installing flooring "patches." More particularly, Urbano, the on-site manager for Defendant's flooring subcontractor, testified that there was a "systematic problem" with the flooring, that the only way to repair the flooring was to reinstall large portions thereof, and that he so advised Defendant.

To be sure, the parties place different emphases on certain portions of Urbano's testimony. But when viewed now in a light most favorable to Plaintiff, that testimony indicates that Defendant was on notice of chronic problems with the flooring and that

mere patching would not suffice.[1]

---

[1] The relevant trial testimony of Urbano proceeded as follows:

Q. Did you ever advise anybody at [Defendant] that there was a systematic problem with the underlayment under the operating room floors at Berkshire Medical Center?

A. I may have talked to Bill. I know Bill Jarvis, you know, after I had taken a look at these that I thought there was a definite issue.

Q. You may have talked to him or you did?

A. I did.

Q. And you told him there was a systematic problem?

A. Yeah. There was something wrong that I felt needed to be repaired, yes.

Q. And what did you mean by that? What needed to be done to repair it?

A. I didn't think what we were doing was exactly the answer, you know. It felt kind of like putting a Band-Aid on it. You know what I mean? It didn't -- it wasn't, well, solving it. I thought it had to be a little bit larger repairs.

Q. You mean the patching wasn't solving it?

A. No. Putting in the vinyl repairs, cutting out a square and fixing it and then coming back and fixing another area that's going bad, it didn't make sense to me to just do that type of repair work.

Q. You felt that wasn't solving the problem?

A. Not -- no, I did not feel was solving the problem.

Q. What did you feel needed to be done?

A. I thought a portion, a portion of the OR suite needed to be

Q.  changed.  How much we were trying to quantify I believe, but I think a portion of it.  I don't believe the whole thing needed to be replaced but I dod think a portion of it should have been.

Q.  Replaced meaning --

A.  Yes.

Q.  -- the old floor torn up and a new floor put in?

A.  Yes.

Q.  How would you determine what areas needed to be replaced and what areas didn't?

A.  You'd have to definitely go through it, walk through it, probably sound it, kind of tap it along to see if there are any hollow areas that may not show as a bubble you know but are there, you know, that it's going to say it's going to happen later, you know.  Eventually it's going to bubble.  Eventually it's going to cause a bubble.  If you just sound it, you can hear a hollow sound to it.

Q.  If you had a systematic problem with underlayment, you don't know where the next bubble is going to occur, do you?

A.  Not necessarily so.

.  .  .  .

Q.  You went back on more than one occasion to do some patchwork on the bubbles, correct?

A.  Yes.

Q.  Put aside exactly how many, it was certainly more than one or two?

A.  Correct.

Q.  And after you had done a number of them over some period

There was also sufficient evidence -- including the testimony of Romeo, Urbano and Andrew Goldslagger, as well as Defendant's Exhibits 3 and 4 -- that problems with the floor were identified within one year of the day the operating suites were turned over to Plaintiff, *i.e.*, January 5, 2004, and that the remedies undertaken by Defendant to cure ongoing bubbles and ruptured seams were not adequate to satisfy its warranty obligations. It was also well within the province of the jury to determine that the flooring suffered from a systemic failure within the first year, even though the cause thereof -- the failure of the underlayment -- may not have been discovered until somewhat later. Finally, there was testimony that, although Defendant's subcontractor patched the flooring on several occasions from 2004 through 2006, there was never a period of more than four months during which there were no evident flooring defects.

On these facts and others, the jury had sufficient evidence with which to conclude that Plaintiff had proven by a preponderance of the evidence not only that

---

        of time, it began to occur to you that maybe this requires a larger solution.

A.     Correct.

        . . . .

Q.     And you don't remember exactly when it occurred to you that there might be a larger solution to the operating room problem?

A.     Well, I knew after I sent my second crew back in there that if these problems are growing, that's when I knew it was going to be -- I felt it was a bigger issue than just putting a man on it.

(Doc. No. 64, Ex. A (Urbano Tr.) at 13-15, 20, 21.)

Plaintiff had performed *its* obligations under the Trade Contractor Agreement or was excused from such performance, but that Defendant breached the express warranty contained therein such that the entire flooring had to be replaced. Indeed, Defendant in its motion anticipated many of these facts, although Defendant attempts to give such evidence little weight. In the end, the evidence was not so one-sided that Defendant itself was or is plainly entitled to judgment on the first two questions posed to the jury.

B.  <u>Evidence Regarding Workmanship or Material</u>

Defendant also argues that there was no competent expert testimony as to the cause of the defects, whether workmanship or materials. More specifically, Defendant argues that "[t]he jury was left with no guidance as to how to sort through the conflicting testimony on the quality and performance of the underlayment," the material for which, Defendant claims, was not its responsibility. (Def.'s Brief at 15.) Once again, the court disagrees.

As Plaintiff argues, the jury was in fact presented competent evidence that the flooring defects were caused by "faulty workmanship and/or materials," the condition necessary to invoke the contractual warranty, and that this issue was not beyond the understanding of the jurors. Romeo, Urbano and LaRoche variously testified that the underlayment had crumbled, that this was not how the underlayment was designed to perform, and that the failure of the underlayment caused the vinyl flooring to buckle. This was hardly "conflicting" testimony. Moreover, Urbano testified that he used the same underlayment material in prior installations and had never encountered the magnitude of bubbling and ruptures found at Plaintiff's facility. In addition, Romeo

9

testified that the bubbling began before the operating suites were turned over to Plaintiff, thereby precluding Plaintiff's own maintenance or use of the site as the cause of the problem.

To be sure, as Plaintiff acknowledges, the only cause not precluded by the testimony was the composition and preparation of the underlayment compound itself. But, as Plaintiff argues, the warranty made Defendant liable for repairing any defect caused by the faulty underlayment, as well as from improper preparation or installation. In this regard, the evidence before the jury, particularly Urbano's testimony, made clear that Defendant was responsible for all aspects of the underlayment preparation and installation.  In addition, both Urbano and Goldslagger testified that the underlayment prepared and installed by Defendant was "wavy" and "uneven."  Given that the evidence indicated that the underlayment thereafter failed, whatever the "scientific" basis for that failure, it was well within the jury's ability, in light of all the evidence, to attribute that failure to Defendant's workmanship or choice of materials.  Simply put, this was not a case of such complexity as to require the type of expert testimony that Defendant deems to have been necessary.

C.  Evidence of Damages

Finally, Defendant asserts that Plaintiff's evidence of damages violated certain proportionality principles mentioned in an unpublished First Circuit case, *North Attleboro Arms Realty Trust v. Hartford Fire Ins. Co.*, 23 F.3d 394, 1994 WL 159445, at *2 (1st Cir. Apr. 29, 1994) (citing *Concannon v. Galanti*, 202 N.E.2d 236, 238 (Mass.

1964)).[2] In essence, Defendant asserts that the original contract price for the installation of all the flooring in the project was less than Plaintiff's claimed replacement costs for just the operating suite, even though the operating suite represented less than ten percent of the entire square footage of the original project. That, in Defendant's view, should preclude Plaintiff's recovery in this case.

Defendant's argument is both brief and, in the court's view, unpersuasive. First, as Plaintiff argues, the unreasonable "economic waste" doctrine mentioned in *North Attlleboro*, if doctrine it is, was designed to prevent a plaintiff from gaining a windfall by garnering an award that exceeds its actual loss. *See id.*, 1994 WL 159445, at *2. Here, however, Plaintiff presented evidence of what it actually spent, bill by bill, to repair the defective floors. Such repair, after all, could fairly be understood by the jury, given all the evidence, to cost significantly more than the original installation insofar as it involved, among other matters, demolition, biological containment in a working environment, and phased installation. In contrast, the claimed damages in *North Attleboro* were estimates only, not actual expenditures, and the plaintiff there provided no concrete evidence of loss. *See id.*, 1994 WL 159445, at *2.

Second, unlike *North Attleboro*, the instant matter concerns a breach of warranty, not a simple contract. Thus, Defendant here was required to make good on its original obligation to properly install quality floors. In this regard, the jury was

---

[2] While, in certain circumstances, unpublished First Circuit decisions may be cited by litigants, "a panel's decision to issue an unpublished opinion means that the panel sees no precedential value in that opinion." United States Court of Appeals for the First Circuit, Local Rule 36.0(c).

instructed that, should it find Defendant liable under the warranty, as it did, it must determine not only whether the claimed damages were caused by Defendant (Instruction No. 32) but, as well, the "reasonable cost of completion and repair" under all the circumstances (Instruction No. 34). The jury evidently took these instructions seriously; in fact, the jury did not award the full amount of damages sought by Plaintiff, approximately $398,000, but eighty-three percent of that amount, *i.e.*, $331,835.

## IV.  CONCLUSION

As described, the jury's verdict was by no means unsupported by the evidence. The evidence was fully and adequately presented by both sides and the jury reasonably reached the verdict it did. In turn, Defendant has failed to bear its burden of convincing the court that it is entitled to a judgment as a matter of law. Accordingly, Defendant's motion is DENIED.

IT IS SO ORDERED.

DATED: July 9, 2010

                                              /s/ Kenneth P. Neiman
                                              KENNETH P. NEIMAN
                                              U.S. Magistrate Judge